UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALMONTE MARKET, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cv-30035-KAR |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
(Docket No. 30)

ROBERTSON, U.S.M.J.

I.      INTRODUCTION

This matter is before the court on the unopposed motion for summary judgment of the

United States ("the government") (Dkt. No. 30).  The Plaintiff, Almonte Market ("Plaintiff"),

commenced this action, pursuant to 7 U.S.C. § 2023(a)(13), seeking judicial review of the United

States Department of Agriculture's ("USDA") Food and Nutrition Service's ("FNS") decision to

permanently disqualify it from participating in the Supplemental Nutrition Program ("SNAP")

because the store likely trafficked in SNAP benefits.   The parties have consented to this court's

jurisdiction (Dkt. No. 21).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons that

follow, the court grants the government's motion for summary judgment.

II.      BACKGROUND

A.      The Store

The Almonte Market was a small (not more than 1,125 square feet) grocery store located in Holyoke, Massachusetts (Administrative Record "A.R." at 68, 90, 121, 256).[1] Plaintiff sold general staple items -- breads and cereals, dairy products, frozen foods, canned fruits and vegetables, produce, and canned meats and fish -- tobacco products, alcohol, deli meats and cheeses, made-to-order sandwiches, hot food, pet food, and household supplies (A.R. at 67, 92, 93, 96, 121). The store did not have shopping baskets or shopping carts available for customers' use (A.R. at 67, 90). A large slide-top floor freezer stood in front of the one small, "cluttered" checkout counter (A.R. at 109, 113, 130, 256).

The FNS authorized Plaintiff's participation in SNAP on June 26, 2003 (A.R. at 118). The store had one SNAP point-of-sale device (A.R. at 91, 256).

B.     SNAP

"Congress established SNAP 'to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households.'" *Irobe v. U.S. Dep't of Agric.,* 890 F.3d 371, 375 (1st Cir. 2018) (quoting 7 U.S.C. § 2011). *See* 7 C.F.R. § 271.1. Approved retail food stores may accept SNAP benefits as payment for eligible food items. *See* 7 U.S.C. §§ 2012(k), 2013(a).

Households meeting the requirements to obtain SNAP benefits use electronic benefit transfer ("EBT") cards, which are similar to debit cards, to purchase eligible food items at authorized stores. *See* 7 U.S.C. §§ 2012(i), 2014, 2016. "In a typical SNAP transaction, a cashier rings up the total food purchases, a household member pays using her EBT card through

---

[1] The references to the administrative record cited herein are to the unredacted records.

a point-of-sale device, and the funds in the household's SNAP account are electronically transferred to the store's bank account." *Irobe,* 890 F.3d at 375.

"[A]ny food or food product for home consumption except alcoholic beverages, tobacco, and hot foods or hot food products ready for immediate consumption" are eligible to be purchased with SNAP benefits.  7 U.S.C. § 2012(k); 7 C.F.R. § 271.2.  Qualified households are not permitted to use their EBT cards to obtain cash.  *See Irobe,* 890 F.3d at 375 (citing 7 U.S.C. § 2012(k); 7 C.F.R. § 271.2).

A store that exchanges SNAP benefits for noneligible items, including cash, engages in unlawful trafficking.  *See J & L Liquor, Inc. v. United States*, Case No. 16-10717, 2017 WL 4310109, at *1 n.1 (E.D. Mich. Sept. 28, 2017) ("Trafficking is the term for a number of fraudulent schemes including buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via . . . EBT cards for cash or consideration other than eligible food.") (citing 7 C.F.R. § 271.2).  "For instance, a store traffics when it 'accept[s] food stamps for sales that never took place,' allowing its customers to receive 'cash rather than merchandise.'"  *Irobe,* 890 F.3d at 375 (alteration in original) (quoting *Idias v. United States*, 359 F.3d 695, 698-99 (4th Cir. 2004)).

The FNS administers and polices SNAP.  *See Hamdi Halal Mkt., LLC v. United States,* 947 F. Supp. 2d 159, 161-62 (D. Mass. 2013).

> The [FNS] tracks each SNAP household's use of its SNAP benefits through the EBT point of sale system found in each SNAP retailer's location.  Each time a SNAP participant uses his EBT card as payment, the EBT point of sale system collects and sends data to the [FNS].  The [FNS] aggregates the data and analyzes it though the Anti-Fraud Locator Using Electronic Benefit Transfer Retailer Transactions ("ALERT") system. The ALERT system is designed to detect suspicious SNAP benefit usage indicative of fraud or SNAP benefit trafficking.

*Famous Int'l Mkt. v. United States*, CIVIL ACTION NO. 17-4897, 2018 WL 3015249, at *1

(E.D. Pa. June 15, 2018).

> If the FNS detects a statistically unusual pattern of SNAP transactions at a SNAP-authorized store, it typically refers the matter to a program specialist who arranges for a contractor to visit the store and conduct an on-site investigation. After completing her review of the relevant EBT data and whatever reports emerge from the on-site investigation, the program specialist makes a recommendation to the FNS section chief. If this recommendation is for further action, the section chief sends a charge letter detailing the allegations to the store and affords the store an opportunity to respond. Thereafter, the FNS issues its determination.

> *Irobe*, 890 F.3d at 375–76 (citing 7 C.F.R. § 278.6(b), (c)). "If . . . the FNS determines

that a store has engaged in trafficking, the store is permitted to pursue an appeal to an

administrative review officer ('ARO')." *Madi v. United States*, Civil Action No. 3:16-cv-30064-

KAR, 2018 WL 3130641, at *2 (D. Mass. June 26, 2018) (citing 7 U.S.C. § 2023(a)(3); 7 C.F.R.

§§ 279.1(a)(2), 279.5)). The store has the right to appeal the ARO's final decision to a federal

district court. *See* 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.7.

The FNS is required to permanently disqualify a firm from participating in SNAP if it

finds that personnel of the firm have trafficked. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. §

278.6(e)(1)(i). "In certain circumstances, [however,] the agency may impose civil monetary

penalties instead of a ban." *Madi,* 2018 WL 3130641, at *2. *See* 7 U.S.C. § 2021(b)(3)(B); 7

C.F.R. § 278.6(i).

C.    The FNS Investigation and Disqualification of Plaintiff

In the instant case, after the "Almonte Market appeared on the EBT ALERT System as

having met patterns consistent with possible EBT trafficking violations," a program specialist in

the Investigative Analysis Branch of the FNS analyzed Plaintiff's transaction data for the period

from August 2016 to March 2017 and compared that data with the EBT data from similar stores

(A.R. at 117-43). A contractor conducted an on-site visit in May 2017 (A.R. at 90-96, 120). The FNS's analysis revealed two patterns that it deemed to be consistent with trafficking: rapid and repetitive transactions from the same household account in a short period of time; and excessively large transactions (A.R. at 122-24). Consequently, on June 20, 2017, the Section Chief of the FNS Retailer Operations Division sent Plaintiff a charge letter with attachments notifying it that the FNS was charging it with trafficking in SNAP benefits and inviting its response (A.R. at 172-204). Plaintiff's attorney's response to the charge letter included seven pages of register receipts (A.R. at 207-11, 214-24). After receiving the store's answer to the charge including a request for hardship consideration, on August 1, 2017, the FNS determined that Plaintiff had engaged in trafficking and imposed the penalty of permanent disqualification from participation in SNAP (A.R. at 227, 235-36).

Plaintiff filed a timely written request for an administrative review of the FNS's decision to permanently disqualify it from participating in SNAP and, thereafter, submitted approximately fifty-three pages of inventory invoices from its wholesale distributor (A.R. at 238-40; Dkt. No. 36-2 at 2-55). On February 8, 2018,[2] the ARO affirmed the determination that the store had engaged in trafficking and the decision to impose a permanent disqualification (A.R. at 250-62).

Plaintiff filed a complaint in this court challenging the FNS's determination that it had engaged in trafficking (Dkt. No. 1). *See* 7 U.S.C. § 2023(a)(13). The unredacted administrative

---

[2] Although the Final Agency Decision is dated "February 8, 2017," there is obviously a typographical error concerning the year given that the charge letter was issued on June 20, 2017, the determination letter was issued on August 1, 2017, Plaintiff filed its complaint on March 9, 2018, and the government has not alleged that the complaint was untimely (A.R. at 145, 235; Dkt. No. 1). *See* 7 U.S.C. § 2023(a)(13) (in order to obtain judicial review, the complaint must be filed in the United States District Court within thirty days of "delivery or service" of the ARO's decision).

record was submitted to the court under seal (Dkt. No. 36). The government has moved for summary judgment and has submitted a statement of undisputed facts, which references the administrative record (Dkt. Nos. 30, 36). Plaintiff has not filed an opposition.

III. STANDARDS OF REVIEW

A.     Standards of Review of the FNS's Decisions

1.     Trafficking in SNAP Benefits

The district court must conduct a de novo review of the validity of the FNS's administrative determination that Plaintiff engaged in trafficking. *See Irobe,* 890 F.3d at 376; 7 U.S.C. § 2023(15); 7 C.F.R. § 279.7(c). When a court reviews a store's liability for trafficking, "it must reexamine 'the entire matter' instead of simply determining 'whether the administrative findings are supported by substantial evidence.'" *Irobe,* 890 F.3d at 376 (quoting *Ibrahim v. United States,* 834 F.2d 52, 53 (2d Cir. 1987)). Put another way, "[t]he Court must reach its own factual and legal conclusions and is not limited to matters considered in the administrative proceedings." *Ramirez v. United States,* 514 F. Supp. 759, 763 (D.P.R. 1981).

2.     The Penalty for Trafficking

The standard of review of the penalty imposed for trafficking is different. "A reviewing court may disturb the agency's choice of a sanction only if it finds that choice to be 'arbitrary, capricious, or contrary to law.'" *Irobe,* 890 F.3d at 377 (quoting *Mass. Dep't of Pub. Welfare v. Sec'y of Agric.,* 984 F.2d 514, 520 (1st Cir. 1993)).

B.     Standard of Review of an Unopposed Summary Judgment Motion

Summary judgment is appropriate where the record, construed in the light most favorable to the nonmovant, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See McKenney v. Mangino,*

873 F.3d 75, 80 (1st Cir. 2017). "Material facts are those that 'possess[ ] the capacity to sway the outcome of the litigation under the applicable law[,]' and there is a genuine dispute where an issue 'may reasonably be resolved in favor of either party.'" *Cheema v. United States*, 365 F. Supp. 3d 172, 180 (D. Mass. 2019) (alterations in original) (quoting *Vineberg v. Bissonnette,* 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation and citation omitted)). "In prospecting for genuine issues of material fact, [the court] resolve[s] all conflicts and draw[s] all reasonable inferences in the nonmovant's favor." *Vineberg*, 548 F.3d at 56.

A party seeking summary judgment is responsible for identifying those portions of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). "So long as the movant crosses this modest threshold, the nonmoving party 'must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'" *Irobe,* 890 F.3d at 377 (alterations in original) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern,* 605 F.3d 1, 5 (1st Cir. 2010)). "Put another way, summary judgment is warranted if a nonmovant who bears the burden on a dispositive issue fails to identify 'significantly probative' evidence favoring his position." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986)).

"An unopposed motion for summary judgment is not automatically granted." *Trzepacz v. United States,* CIVIL ACTION NO. 14-10657-GAO, 2017 WL 470889, at *1 (D. Mass. Feb. 3, 2017). "[T]he court still must determine, on the record before it, whether [the] [d]efendant is

entitled to summary judgment." *Gedeon v. N. Constr. Servs., LLC*, Civil Action No. 15-cv-30038-KAR, 2016 WL 6832620, at *2–3 (D. Mass. Nov. 18, 2016). "[E]ven an unopposed motion for summary judgment should not be granted unless the record discloses that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Rivera–Torres v. Rey–Hernández*, 502 F.3d 7, 13 (1st Cir. 2007) (citing *Vélez v. Awning Windows, Inc.*, 375 F.3d 35, 42 (1st Cir. 2004); *Mendez v. Banco Popular de P.R.*, 900 F.2d 4, 7 (1st Cir. 1990)). "In most cases, however, 'a party's failure to oppose summary judgment is fatal to its case.'" *Ferreira v. Mortg. Elec. Registration Sys., Inc.*, 794 F. Supp. 2d 297, 301 (D. Mass. 2011) (quoting *Pérez–Cordero v. Wal–Mart P.R.*, 440 F.3d 531, 533–34 (1st Cir. 2006)).

IV.    ANALYSIS

A.    The FNS's Determination that Plaintiff Engaged in Unlawful Trafficking in SNAP Benefits was Valid.

"The resolution of . . . a [summary judgment] motion may depend on which party bears the burden of proof on a particular issue." *Irobe,* 890 F.3d at 377-78 (citing *E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados,* 279 F.3d 49, 55 (1st Cir. 2002); *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35-36 (1st Cir. 1998)). In the First Circuit, the store bears the burden of demonstrating by a preponderance of the evidence that it did not engage in trafficking and that the FNS's action was invalid. *Id.* at 378. *See Cheema,* 365 F. Supp. 3d at 181.

The summary judgment analysis begins with the evidence the FNS presented in support of its motion. *See Celotex Corp.,* 477 U.S. at 323. The FNS permissibly relied on an analysis of about eight months of transaction data from the EBT database and a contractor's on-site visit to the Almonte Market when it determined that Plaintiff engaged in trafficking. *See* 7 U.S.C. §

2021(a)(2) (the disqualification of a retail store can be based on "evidence that may include facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer [EBT] system."); *Idias,* 359 F.3d at 698 (the government may permanently disqualify a retailer based on "irregular and suspicious activity" gleaned from EBT data); *see also* 7 C.F.R. § 278.6(a) (same).

The court "give[s] no weight to the agency's finding that trafficking occurred." *Irobe,* 890 F.3d at 379. To carry its summary judgment burden, however, "[t]he [FNS] need not adduce evidence it caught [Plaintiff] 'red-handed' engaging in SNAP benefit trafficking." *Famous Int'l Mkt.,* 2018 WL 3015249, at *10. Instead, the court, like the FNS, can "rely on circumstantial evidence created by EBT data" when determining whether or not to grant summary judgment. *Cheema*, 365 F. Supp. 3d at 181. Consistent with the treatment of circumstantial evidence in other contexts, the court is permitted to draw reasonable inferences from the evidence. *See Irobe,* 890 F.3d at 379 (the court considered circumstantial evidence, and reasonable inferences drawn from the evidence, in allowing the government's summary judgment motion).

In an unopposed summary judgment motion, the court then considers the administrative record to determine whether the evidence Plaintiff proffered to the FNS sustained its burden of presenting "'significantly probative'" evidence demonstrating that the irregular EBT transaction data was not due to trafficking. *Irobe,* 890 F.3d at 377 (quoting *Anderson,* 477 U.S. at 249-50). "[C]onclusory generalizations" are insufficient to survive a summary judgment motion. *Id.* at 380 n.3. *See Famous Int'l Mkt.,* 2018 WL 3015249, at *10.

In the instant case, after analyzing the EBT database transactions that Plaintiff processed from August 2016 to March 2017 and conducting an on-site visit to the Almonte Market, the FNS identified two transaction patterns indicative of trafficking in SNAP benefits. Specifically,

the FNS alleged that the Almonte Market processed: (1) multiple transactions made from the same individual household EBT accounts within unusually short periods of time; and (2) "[e]xcessively large purchase transactions" when compared to grocery stores of similar sizes (A.R. at 257). Notwithstanding the government's contrary claim, the First Circuit has not required a store to rebut every alleged unlawful transaction (Dkt. No. 35 at 20-23). *See Irobe,* 890 F.3d at 380 n.3 ("We are skeptical of any interpretation [of the Sixth Circuit's] statement that would always require a transaction-specific rebuttal of every transaction.") (citing *Ganesh v. United States,* 658 F. App'x 217, 219 (6th Cir. 2016)). Even so, when viewed in light of the summary judgment standard and the circumstantial evidence of trafficking, the evidence Plaintiff presented to the FNS falls short of demonstrating a triable factual issue and the government is entitled to summary judgment. *See Cedar Food Mkt. 7, Inc. v. United States*, Civil No. 18-3470 (RMB/KMW), 2019 WL 6907489, at *4 (D.N.J. Dec. 19, 2019) ("[Plaintiff's] explanations for these patterns are, as FNS found, either incomplete or inconsistent with the evidence, and therefore insufficient to defeat summary judgment.") (citing *Irobe,* 890 F.3d at 380).

### 1. Repetitive transactions made from the same household EBT accounts within an unusually short time support a finding of SNAP benefit trafficking.

Multiple, rapid transactions by the same SNAP-eligible household is a well-recognized indicator of SNAP benefit trafficking. *See K & O Food Mart v. U.S. Dep't of Agric.,* Case No. 3:18-cv-30026-KAR, 2019 WL 2870313, at *5 (D. Mass. July 3, 2019); *Cheema,* 365 F. Supp. 3d at 185. The FNS posits that stores that are engaged in trafficking "often conduct multiple transactions from the same household account in short periods of time to avoid the detection of single high-dollar transactions that cannot be supported by the retailer's inventory, store type and structure" (A.R. at 257).

In the instant case, the FNS identified eighty-five EBT transactions where a single household account made multiple withdrawals involving relatively high dollar amounts within a short time (A.R. at 175-79, 257).  The eighty-five transactions consisted of thirty-seven sets of transactions made by the same household in timeframes ranging from four hours and eight minutes to twenty-three hours and forty-two minutes (A.R. at 175-79).  The suspect transactions totaled $4,403.41 in SNAP benefits (A.R. at 179).  Of the eighty-five transactions in the thirty-seven sets of repeat visits, the FNS calculated the average amount per transaction to be $51.80 and the average transaction amount per set to be $119.01 (A.R. at 179, 257).  According to the FNS, these large dollar amounts were "highly unusual" when compared to the amounts of repeat visit purchases in other stores in the Holyoke area that were similar in terms of size and inventory (A.R. at 257).

The timing and size of the identified transactions permits the reasonable inference that Plaintiff exchanged SNAP benefits for cash.  For example, one SNAP-eligible household swiped its EBT cards three times within about four hours and nine minutes (A.R. at 175).  The transactions were in amounts of $29.89, $63.49, and $42.10 for a total of $135.48 (A.R. at 175). Another household visited the store four times within twenty hours and forty-nine minutes and spent $45.83, $23.19, $47.22, and $46.21 for a total of $162.45 (A.R. at 177).  In addition to the short timeframes of those transactions, the dollar amounts of the transactions indicated trafficking given that Plaintiff's inventory consisted mostly of low priced food and did not include high-priced meat, seafood, or other specialty items (A.R. at 91, 92, 229).  *See Irobe,* 890 F.3d at 379 ("the factfinder may reasonably infer trafficking when the redemption data shows that a small store with a selective inventory and limited staffing regularly processes purported high-dollar SNAP transactions in rapid succession.").  Moreover, there was a single cash register

at a small, "cluttered" checkout counter and there were no optical scanners, shopping baskets, or shopping carts that would facilitate the purchase of multiple items in a single transaction for the alleged large-dollar amounts (A.R. at 67, 90, 91, 120, 130, 256). [3]  *See Famous Int'l Mkt.,* 2018 WL 3015249, at *13; *Nadia Int'l Mkt. v. United States,* Case No. 5:14-cv-82, 2015 WL 7854290, at *7 (D. Vt. Dec. 2, 2015), *aff'd,* 689 F. App'x 30 (2d Cir. 2017) ("The fifty-four transactions reflecting multiple highly priced purchases with high dollar transaction amounts by the same household in timeframes ranging from fifty seconds to twenty-two hours and fifty-one minutes are also indicative of trafficking because [p]laintiff did not have a wide variety of highly priced food items available.  It is thus unlikely that, without shopping carts and with only a few handheld baskets, a household could carry the items necessary to reach these high dollar amounts.").

Plaintiff pressed several grounds to dispute the FNS's allegation that rapid purchases by the same household evinced trafficking in SNAP benefits.  Specifically, Plaintiff argued that:  the store did not traffic in SNAP benefits; the allegedly suspicious transactions constituted only 1% of the store's total transactions during the eight month period from August 2016 to March 2017; the SNAP regulations did not prohibit households from shopping at the store multiple times in the same day; and Plaintiff's attorney shopped in the same store on the same day or on consecutive days (A.R. at 207-08, 215, 251, 254-55).  Plaintiff also submitted seven pages of

---

[3] The administrative record contains inconsistent information concerning the number of shopping baskets that were available.  According to the reports of the on-site visits to the store in February and May 2017, there were no baskets (A.R. at 67, 70, 90, 94).  However, the final FNS decision indicates that there were "two handheld shopping baskets" at the time of the contractor's in-store visit (A.R. at 256).  In view of the strong evidence of trafficking, the inconsistency is inconsequential.

copies of register receipts in an effort to demonstrate that the allegedly abnormal EBT transaction patterns did not constitute circumstantial evidence of trafficking (A.R. at 218-24).

Plaintiff's general denial of the trafficking charge and unsupported claim that the EBT transaction data cited by the government, which represented 1% of the sales for the eight month period, was not "unusual, irregular and inexplicable" are easily dismissed as conclusory (A.R. at 208, 251). "The [store's] factually unsupported arguments do not create a genuine dispute about the legitimacy of the irregular EBT transactions." *Rodriguez Grocery & Deli v. U.S., Dep't of Agric. Food & Nutrition Serv.*, Civil No. WDQ-10-1794, 2011 WL 1838290, at *4 (D. Md. May 12, 2011). *See Irobe,* 890 F.3d 380 n.3. Further, the fact that the suspect transactions constituted a small percentage of the total sales for the period under investigation is not persuasive. *See id.* at 381 ("Merchants may conduct legitimate business side-by-side with unlawful trafficking.").

Plaintiff's contention that it was not prohibited from selling groceries to a household multiple times within twenty-four hours is similarly unavailing (A.R. at 207-08). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (footnote omitted). The FNS did not disqualify Plaintiff for selling items to the same SNAP households more than once within twenty-four hours. Instead, the government found trafficking based on the pattern of transactions. "Multiple transactions over a short period of time, especially of high dollar value, are very suspicious because they are typical of stores which are attempting to conceal signs of trafficking" (A.R. at 229). Plaintiff's attorney's personal experience of shopping at a grocery store multiple times in a single day, which was not submitted in the form of an affidavit, was inadequate to raise a genuine issue of material fact (A.R. at 215). *See Irobe,* 890 F.3d at 377 (to defeat summary

13

judgment, "[t]he nonmovant must point to materials of evidentiary quality") (citing *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 49-50 (1st Cir. 1990)); *J & L Liquor, Inc.*, 2017 WL 4310109, at *6 ("general statements about customers' shopping patterns or other customer practices are not enough to create a triable issue of fact.").

Finally, even when viewed in the light most favorable to the Plaintiff, the copies of the register receipts it proffered were not sufficient to refute the inference that the eighty-five identified transactions (thirty-seven sets) evinced trafficking. The receipts from one day in September 2016, two weeks in October 2016, and one day in November 2016 did not identify the name of the store or itemize purchases (A.R. at 218-24). Instead, they listed all items as "GROCERY NO TAX" and showed payment as "CASH" (A.R. at 218-24). Even assuming that the receipts were from the Almonte Market, they failed to establish that customers purchased SNAP-eligible food with their EBT cards. Consequently, the generic receipts are insufficient to refute the strong evidence of trafficking demonstrated by the thirty-seven sets of questionable transactions identified by the FNS (A.R. at 257).

Plaintiff's proffered explanations for the thirty-seven sets of transactions made from the same household accounts in rapid succession are insufficient to rebut the strong inference that Plaintiff was trafficking in SNAP benefits and to create a genuine issue of material fact. *See Irobe,* 890 F.3d at 380 ("Where the plaintiff has the burden of proof, 'there must be evidence on which the [factfinder] could reasonably find for the plaintiff.'") (alteration in original) (quoting *Anderson,* 477 U.S. at 252); *Cheema,* 365 F. Supp. 3d at 185.

## 2. High-dollar transactions support a finding of SNAP benefit trafficking.

The government identified 304 suspicious high-dollar EBT transactions that occurred at

the Almonte Market between August 2016 and March 2017 (A.R. at 180-204). According to the FNS, the average totals of the 304 transactions and the unusual amounts of some of those transactions provided additional evidence that Plaintiff trafficked in SNAP benefits (A.R. at 180-204, 257). Plaintiff countered that it was not permitted to limit the amounts of its customers' purchases and the majority of the 304 transaction amounts were not unusual or excessive particularly because the store was popular in the neighborhood and its customers bought high-priced cans of infant formula and cases of "reinforced fruit drinks" (A.R. at 208, 216). Plaintiff submitted the alleged register receipts and copies of invoices from its wholesaler in an attempt to show its legitimate sales of it those high-priced SNAP-eligible items (Dkt. No. 36-2 at 4-55; A.R. at 216).

The FNS's position -- that the large number of high-dollar EBT transactions proved trafficking -- was supported by the comparison of data. Plaintiff's EBT transaction history from August 2016 to March 2017 was compared to the EBT transactions of other small grocery stores in Massachusetts and in Hampden County and Holyoke, where the Almonte Market was located, for the same time period. *See Cheema,* 365 F. Supp. 3d at 187 (to prove trafficking in SNAP benefits based on high-dollar transactions, the FNS compared the suspect store's transaction history with that of other similar stores). The EBT database revealed that the 304 suspicious SNAP transactions totaled $22,756.72 (A.R. at 204, 257). There were three transactions for $150.00 or more, including one for $174.64, and fifteen transactions for amounts between $100.00 and $149.99 (A.R. at 230, 258). Of the 304 suspect transactions, the average transaction amount was $74.85 (A.R. at 257). During the same eight-month period, the average total SNAP transactions for a small grocery store in Massachusetts was $13.42 and the average for a small grocery store in Hampden County was $13.68 (A.R. at 119, 230, 257). When measured against

the state and county averages of comparable stores, the average of Plaintiff's 304 suspect SNAP

transactions was more than five times higher (A.R. at 257). The significant variance between the

average amounts of Plaintiff's suspicious EBT transactions and the average amounts of

comparable small grocery stores' EBT transactions is strong evidence that Plaintiff trafficked in

SNAP benefits. *See Irobe,* 890 F.3d at 379 ("the factfinder may reasonably infer trafficking

when the redemption data shows that a store regularly processes purported SNAP transactions

for significantly higher per-transaction amounts than nearby stores offering similar wares.");

*Nadia Int'l Mkt.,* 2015 WL 7854290, at *7 ("Plaintiff's average monthly EBT transactions from

August to October of 2012 were significantly higher than comparable stores located nearby and

thus also indicative of trafficking EBT benefits."). Further, Plaintiff's average transaction

amount of $10.59 during the investigative period was significantly higher than that of a

comparator small grocery store located within one mile of Plaintiff, which had an average

transaction amount of $7.20 during the same eight month period (A.R. at 31, 133, 142). This

comparison further bolstered the FNS's determination that Plaintiff had engaged in trafficking.

*See Famous Int'l Mkt.*, 2018 WL 3015249, at *14 ("the Market does not adduce specific evidence

addressing why its EBT transaction data differs so greatly from the comparison stores when the

comparison stores carry roughly the same inventory.").

The FNS did not dispute Plaintiff's contention that it was not permitted to limit SNAP

purchases and acknowledged that some large dollar purchases were normal. To support its

determination of a trafficking violation, however, the FNS relied on the excessive number of

large dollar transactions that fit a pattern indicative of trafficking (A.R. at 257-58). *See 109*

*Merrick Deli Corp. v. United States,* No. 11-CV-977(SLT)(RER), 2014 WL 6891944, at *4

(E.D.N.Y. Sept. 30, 2014) ("the trafficking finding is based on inferences drawn from the

suspicious combination of usual electronic data which [the plaintiff] cannot explain away. These are not single isolated incidents but rather numerous incidents forming a pattern of suspicious transactions."). The FNS considered Plaintiff's low-priced SNAP-eligible inventory as one factor in its determination that the store engaged in trafficking (A.R. at 130, 258). The on-site investigator observed that Plaintiff's "most expensive" SNAP-eligible food items were priced at $10.69 (hamburgers), $9.39 (frozen chicken), $8.99 (shrimp), and $8.99 (frozen pizza), and the store did not offer meat bundles, seafood specials, or fruit and vegetable boxes (A.R. at 91, 92). *See Famous Int'l Mkt.,* 2018 WL 3015249, at *14 ("The investigator sent to the [plaintiff market] did not observe meat bundles for sale and the [plaintiff] has not adduced evidence it sold similar meat bundles, which could provide a reasonable explanation for the large transactions."). In addition, the FNS pointed to the physical layout of the store, the absence of shopping carts and optical scanners, and the presence of two supermarkets and three medium-sized grocery stores within a mile radius of the Almonte Market, to further support its contention shoppers were not likely to purchase large orders of SNAP-eligible items from Plaintiff as often as the EBT card data showed (A.R. at 143, 258). *See SS Grocery, Inc. v. U.S. Dep't of Agric., Food & Nutrition Serv.*, 340 F. Supp. 3d 172, 182 (E.D.N.Y. 2018) ("Given [the plaintiff store's] size, layout, lack of shopping carts, as well as lack of technology to quickly process large transactions, it is highly implausible that each and every one of the excessively large transactions took place."); *Sky Grocery, LLC v. U. S. Dep't of Agric.-Food & Nutrition Serv.*, Civil No. 3:15-cv-1082(JBA), 2017 WL 1054484, at *9 (D. Conn. Mar. 20, 2017) ("Given the narrow range of eligible products sold at Sky, the lack of space at the register, the fact that its customers often shop at full range grocery stores nearby, and the fact that its comparators have so many fewer transactions, the volume and amount of sales at Sky are strongly probative of trafficking.").

In response to the FNS's claim that Plaintiff's SNAP transaction average was five times higher than the transaction averages of comparable stores, Plaintiff maintained that the Almonte Market was "very popular in the neighborhood" because the owners were Hispanic and the store was in a "heavily populated area" of mostly Hispanic families with "many children" (A.R. at 208). However, Plaintiff's failure to cite evidence in support of its conclusory assertions dooms its argument. *See Irobe,* 890 F.3d at 381 (a party's "unsupported opinion" is not sufficient to establish a genuine issue of material fact); *Famous Int'l Mkt.,* 2018 WL 3015249, at *14 ("Even assuming the [plaintiff-market] is well-stocked and offers international foods, the [m]arket does not adduce specific evidence addressing why its EBT transaction data differs so greatly from the comparison stores when the comparison stores carry roughly the same inventory.").

Plaintiff fares no better with its assertion that the large number of high-dollar transactions was due to customers' purchases of multiple cans of infant formula, which sold for $17.79, $17.89, or $17.99 a can "depending on the price at the time," and cases of "reinforced fruit drinks," which allegedly sold for more than $46.00 (A.R. at 216, 217). To substantiate its position, Plaintiff relied on the generic register receipts, which were described earlier (A.R. at 218-24). Approximately ten receipts that showed items costing $17.79, $17.89, and $17.99 allegedly corresponded to unusually large-dollar-value EBT transactions on the FNS report (A.R. at 218-21, 223).[4] Because the receipts lacked descriptions of the items that were purchased for the stated amounts, however, they did not prove that they represented purchases of infant formula (A.R. at 218-21, 223). According to the FNS, because SNAP-eligible households are also likely eligible for WIC benefits, and because infant formula can be purchased with WIC

_____

[4] The receipts allegedly represented transaction ## 91, 100, 112, 141, 165, 231, 316, 327, 332, 385 on the FNS report of the large-dollar EBT transactions (A.R. at 218, 219, 220, 221, 223).

benefits, the likelihood that a WIC-eligible household would spend its limited SNAP benefits on infant formula is "exceptionally low" (A.R. at 258-59). Plaintiff did not offer evidence to refute this assertion. However, even assuming that the ten transactions on the receipts were valid, ten transactions out of 304 is not sufficient to create a genuine issue of material fact. *See Famous Int'l Mkt.,* 2018 WL 3015249, at *14 (thirty-two potentially valid high-dollar transactions out of 400 was insufficient to refute the store's explanation for its large transactions).

Similarly, Plaintiff failed to present evidence to support its claim that some of the large transactions were for sales of cases of "reinforced fruit drinks" or that the retail price of a case exceeded $46.00 as the store represented (A.R. at 216). Although the register receipt that allegedly corresponded to transaction # 94 showed that Plaintiff sold a single item that cost $63.25 (A.R. at 224), Plaintiff failed to identify the item that it sold during that transaction. The most expensive item observed during the on-site visit cost $10.69 and Plaintiff claimed that the cost of a can of infant formula ranged from $17.79 to $17.99 (A.R. at 91, 217). Therefore, it is reasonable to infer that the receipts were contrived to mask trafficking in SNAP benefits.

The wholesale invoices that Plaintiff submitted "to show the full line of products sold by the market" did not refute the FNS's proof that Plaintiff engaged in trafficking of SNAP benefits (A.R. at 248). *See Irobe,* 890 F.3d at 381 ("the mere fact that the [plaintiff] bought some SNAP-eligible foodstuffs and sold them to SNAP-qualified households does not insulate it from a finding of trafficking."). Plaintiff submitted seven invoices showing inventory purchases on August 4, 2016, November 17, 2016, December 22, 2016, February 2, 2017, March 16, 2017, May 2017, and July 2017 (Dkt. No. 36-2 at 4-55). Because the investigation focused on the period from August 2016 to March 2017, the FNS did not consider the May and July 2017 invoices (A.R. at 248, 259). The five invoices from within the review period showed purchases

of twelve cans of Similac infant formula on February 2, 2017 and eighteen cans on March 16, 2017 for a total of thirty cans (A.R. at 248, 259; Dkt. No. 36-2 at 4, 12). Plaintiff represented that customers' formula purchases were reflected on the register receipts that it submitted for October 5, 7, 8, 10, and 13, 2016 showing items purchased for $17.79, $17.89, and $17.99 (A.R. at 218-21, 223). In total, the register receipts for the five dates allegedly evinced purchases of forty cans of infant formula (A.R. at 218-21, 223). The comparison of the sales receipts to the invoices for inventory purchases showed that Plaintiff allegedly sold a "significantly higher" amount of formula than it purchased from its wholesaler (A.R. at 248, 259). Because Plaintiff offered no explanation for the reason it allegedly sold more cans to customers than it purchased for its inventory during the investigative period, Plaintiff's claim that the register receipts reflected sales of high-priced infant formula was further discredited.

The FNS presented significant circumstantial evidence that Plaintiff trafficked in SNAP benefits by exchanging them for cash. Plaintiff's evidence, even when viewed through the favorable summary judgment lens, falls far short of the substantial evidence necessary to rebut the government's strong case of trafficking. Accordingly, the government is entitled to summary judgment. *See Dollar Plus Food Mart LLC v. United States*, No. CV-13-01934-PHX-DLR, 2015 WL 11090898, at *5 (D. Ariz. May 8, 2015) ("if the store owner fails to meet [its] burden . . . to demonstrate a material dispute of fact as to the existence of a SNAP program violation, summary judgment may granted in favor of the government") (citing *Kim v. United States,* 121 F.3d 1269, 1271 (9th Cir. 1997)).

      B.    <u>The FNS's Permanent Disqualification of Plaintiff was not Arbitrary, Capricious, or Contrary to the Law.</u>

As noted earlier, the FNS's decision to disqualify Plaintiff will stand if it is not arbitrary, capricious, or unwarranted in law. *See Irobe,* 890 F.3d at 377. Notwithstanding Plaintiff's

request for a civil monetary penalty ("CMP") in lieu of permanent disqualification from participation in SNAP, it failed to comply with the regulations that permit the imposition of a CMP.

A store that commits trafficking violations "shall" be permanently disqualified from SNAP participation. 7 U.S.C. § 2021(b)(3)(B). *See* 7 C.F.R. § 278.6(e)(1)(i) ("The FNS regional office shall . . . [d]isqualify a firm permanently if . . . personnel of the firm have trafficked as defined in § 271.2 . . . ."). However, "[t]he SNAP regulations permit a [firm] that has committed trafficking violations to request the sanction of a [CMP] in lieu of permanent disqualification." *Li Xia Lu v. United States*, CIVIL ACTION No. 18-cv-1969, 2019 WL 2371759, at *7 (E.D. Pa. June 4, 2019) (citing 7 C.F.R. § 278.6(b)(2)(i)). "The request and evidence must be submitted within ten days of receiving the charge letter." *Id.* (citing 7 C.F.R. § 278.6(b)(2)(ii)–(iii)). In order to qualify for a CMP, the firm must submit "'substantial evidence which demonstrates that the firm had established and implemented an effective compliance policy and program to prevent [SNAP] violations . . . ,' by establishing the fulfillment of four criteria enumerated in the SNAP regulations." *Id.* (quoting 7 C.F.R. § 278.6(i)).[5] Although

---

[5] In order to be eligible for a CMP instead of permanent disqualification, a store must establish all of the following criteria by substantial evidence:

> Criterion 1: The firm shall have developed an effective compliance policy as specified in [7 C.F.R.] § 278.6(i)(1); and

> Criterion 2: The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of the violations cited in the charge letter sent to the firm; and

> Criterion 3: The firm had developed and instituted an effective personnel training program as specified in [7 C.F.R.] § 278.6(i)(2); and

> Criterion 4: Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct of approval of trafficking violations . . . .

Plaintiff requested a CMP within ten days of receiving the charge letter, it failed to submit the evidence required by the regulations (A.R. at 216, 234, 261).

Plaintiff's claims that disqualification will cause hardship for the neighborhood and the store are similarly unavailing (A.R. at 227). If a store is found to have trafficked in SNAP benefits, the statute and regulations do not provide an exception to permanent disqualification based on economic hardship. *See* 7 U.S.C. § 2021(b)(3)(B) (disqualification shall be "permanent" upon the "first occasion" of a disqualification based on "trafficking"); *Kim*, 121 F.3d at 1276 ("the only permissible interpretation" of 7 U.S.C. § 2021 is that it prohibits a CMP in lieu of permanent disqualification for trafficking violations even when disqualification imposes a hardship on food stamp households); *Crane Fortune, Inc. v. United States*, Civil Action No. 4:17-CV-3323, 2018 WL 6928539, at *3 (S.D. Tex. Dec. 12, 2018), *rec. adopted sub nom. Crane Fortune LLC v. United States*, Civil Action No. 4:17-CV-3323, 2019 WL 93342 (S.D. Tex. Jan. 3, 2019) ("the hardship exclusion from disqualification is not available or relevant in trafficking cases."); 7 C.F.R. § 278.6(e)(1)(i), (f)(1) ("A civil money penalty for hardship to SNAP households may not be imposed in lieu of a permanent disqualification.").

Because the law requires permanent disqualification in the circumstances presented by this case, there is no basis to disturb the penalty imposed by the FNS.

---

7 C.F.R. § 278.6(i).

V.     CONCLUSION

For the above-stated reasons, the government's motion for summary judgment (Dkt. No.

30) is allowed.  The clerk's office is directed to close the case.

It is so ordered.

Dated:  January 8, 2020                                    /s/ Katherine A. Robertson
                                                           KATHERINE A. ROBERTSON
                                                           U.S. MAGISTRATE JUDGE